**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CET TENNIS ENTERPRISES, LLC** | ) | |
| **and CHRISTINA E. TURDO,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 14 cv 7518** |
| **v.** | ) | |
| | ) | |
| **LEGGETT & PLATT, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT AND JURY DEMAND**

Plaintiffs CET Tennis Enterprises, LLC and Christina E. Turdo as and for their Complaint against Defendant Leggett & Platt, Inc. state and allege as follows:

## I.    Introduction

1.    Plaintiffs CET Tennis Enterprises, LLC and Christina E. Turdo (collectively "CET") formed an oral agreement with Leggett & Platt, Inc. ("L&P"), whereby L&P was to manufacture CET's "Hop-a-Razzi" tennis ball retrieval baskets, per agreed to specifications. However, the baskets L&P manufactured and provided to CET did not meet the agreed upon specifications, and L&P failed to thereafter properly manufacture the goods.  L&P's failures have caused CET to lose its fundamental customer base, and have resulted in millions of dollars in lost profits and the virtual demise of CET's business.

2.    CET brings this action against L&P to recover damages for L&P's breaches of: (1) the party's oral agreement; (2) the express warranty; (3) the implied warranty of merchantability; and (4) the implied warranty of witness for a particular use.  All of the damages CET has

suffered were foreseeable at the time of contracting and have resulted from L&P's breaches of its legal duties.

## II.        Parties

3.      Plaintiff CET Tennis Enterprises, LLC is a limited liability company, formed under the laws of Illinois, with a principal place of business at 1801 Janke Drive, Northbrook, Illinois 60062. The members of CET Tennis Enterprises, LLC are Christina E. Turdo, Joe Padorr, Michael Pepper, and Jim Mann.  All of the members of CET Tennis Enterprises, LLC are citizens and residents of Illinois.

4.      Plaintiff Christina E. Turdo is a member and the President of CET Tennis Enterprises, LLC, and, as noted above, is a citizen and resident of Illinois.

5.      Defendant Leggett & Platt, Inc. is a corporation formed under the laws of Missouri, with its principal place of business at No. 1 Leggett Road, Carthage, Missouri 64836.

## III.       Jurisdiction and Venue

6.      Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, because there is complete diversity between the parties.  Plaintiffs are citizens of Illinois, and Defendant is a citizen of Missouri.

7.      The amount in controversy is reasonably believed to be substantially in excess of $75,000, exclusive of interest and costs.

8.      Venue is proper in this district, pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events and omissions arising out of this cause of action occurred in this district.

9.     This Court has personal jurisdiction over Defendant because Defendant conducts a substantial amount of business in Illinois, and this case specifically arises from business conduct that L&P engaged in in the state of Illinois.

## IV.     Factual Background

10.     CET, founded in 2009, develops and markets new and innovative ball gathering devices in the sporting industry.  After many years as an on-court tennis instructor, Christina E. Turdo, President of CET, invented a tennis ball retrieval system called the "Hop-a-Razzi."

11.     The Hop-a-Razzi is an innovative device used to gather tennis balls when several balls are spread across a tennis court during a workout session or a tennis lesson.  The product has evolved through multiple improvement cycles and culminated in a system that aesthetically and ergonomically changes the way tennis balls are gathered.  Hop-a-Razzi's main features are fourfold: (1) it has wheels for easy portability; (2) it is stackable for saving on storage space and ease of transportation; (3) it has a telescoping handle that allows users of all heights to ergonomically use the basket; and (4) it comes in twelve vibrant colors.

12.     CET has engaged in a consistent effort to continually improve the design for manufacturability, durability and performance of the Hop-a-Razzi.

13.     The Hop-a-Razzi product line includes three models of tennis ball retrieval baskets:  The "Hop Classic" holds 90 tennis balls; the "Hop Junior" holds 65 tennis balls; and the "Hop Pro" holds 125 tennis balls.  All models come with wheels and a telescoping handle.

14.     The Hop Classic has an additional stackable feature that allows for the ease of carrying multiple units at one time, and, when not in use, the stackable feature allows for a nice and neat storage option.

15.     The Hop Junior and the Hop Pro were designed so that the handles can be turned

down to become legs for the basket. When this feature is engaged, the basket holding the balls is popped up off the ground so it is at the player's waist level, making it easy to grab a ball from the basket without bending over or reaching toward the ground. The design allows for the basket to be much more stable in the upright position and less likely to topple over if it is bumped by a player or hit by a ball.

16.     The Hop-a-Razzi baskets have been patented, U.S. Patent No. 8,141,919.

17.     The Hop-a-Razzi baskets are marketed and sold to professional tennis instructors, tennis clubs, resorts, public facilities that operate tennis programs, and consumers who purchase tennis equipment either through wholesale or retail stores.

18.     In 2009, CET hired Microtech Machine, Inc. ("Microtech") to manufacture the three types of Hop-a-Razzi baskets on a limited basis.  Ultimately, CET ordered 6,000 baskets from Microtech, which baskets CET then sold to tennis professionals, clubs, and resorts.  The 6,000 baskets manufactured by Microtech sold out within three months.

19.     CET wanted to improve on the manufacturing job that Microtech did, and it wanted to lower the overall manufacturing cost of the basket.  Ms. Turdo's friend, Don Ayres, who ran one of L&P's manufacturing divisions, told her that she should consider using L&P as her supplier, as it had overseas manufacturing plants where it could manufacture the products much cheaper due to lower labor costs, etc.

20.     Beginning around June, 2010, CET and L&P engaged in discussions and negotiations, which continued for more than a year before they reached an oral agreement regarding L&P's manufacture of the Hop-a-Razzi baskets.

*--The Terms of the Parties' Oral Agreement*

21.     In 2011, CET provided to L&P a sample basket for the Hop Classic, the Hop

4

Junior and the Hop Pro ("sample baskets"), which samples had been manufactured by Microtech. CET and L&P agreed that L&P was to manufacture the baskets as closely as possible to the sample baskets, with certain discussed exceptions to improve the overall quality of the baskets.

22.     Subsequently, L&P manufactured a prototype basket ("prototype basket"), which was not a mirror image of the sample basket; however, the parties discussed the changes that needed to be made to the prototype, including the changes needed to make the prototype basket like the sample baskets.  The parties agreed such changes would be implemented before the actual baskets that would be for sale were manufactured and delivered.  The changes to the prototype basket that the parties agreed to included: using 5.55 mm sized wire; the welding was to be a 360 degree weld; the pin used was going to be a "solid" pin; and the powder coating was to appear more vibrant.

23.     The parties agreed that all dimensions forming the basket geometry were derived via measurement of the dimensions and features of the sample baskets received in 2011.

24.     All means of basket member joining were to also replicate the 2011 sample baskets. The means of welding were to be "TIG," and the welds were to encompass the entire circumference of the wire ends when forming T-joins.

25.     As with the basket geometry, the parties agreed that the sample basket materials were to be closely replicated as follows:

- Basket Main Body and Lid (on models applicable) — mild steel wire 5.55 mm diameter;

- Decal Plate — mild steel sheet 2min;

- Upper handle section — 16mm dia. x 1.5mm mild steel tube (Classic Handle has 1.2 mm wall due to need for increased flexibility during the telescoping function);

- Lower handle section — 12.5mm dia. x 1.5mm mild steel tube;

- Handle Bracket — mild steel sheet 2mm;

- Handle Pivot Pin — mild steel 4.8 mm dia.;

- Wheel — Nylon 6/10 or similar, size 13 mm (standard element);

- Wheel Pin — Mild steel or bronze (standard element);

- Handle Bumper — rubber or similar (standard element);

- Handle Spring Button — stainless steel or similar (standard element) — NOTE: button section of this component is to be solid;

- Basket 8001 will have "U.S. Patent No. 8,141,919" and lot number "CT0000" engraved on the back of the logo plate;

- Baskets 8002 and 8003 will have the lot number "CT0000" only engraved on the back of the logo plate; and

- The lot number "CT0000" has the prefix "CT" followed by 4 characters referencing the order lot number, starting with 0001 and ascending.

26.     All baskets were to be powder coated to a thickness of 80-120 micron thickness with a standard powder coat product, and were to be subject to a zinc phosphate coating process prior to powder coating.

27.     The parties also agreed that the goods would be more ***durable*** than the other tennis ball retrieval systems on the market, and L&P knew that CET was offering its end users a One Year Guarantee program, whereby CET would replace for free, including shipping, any Hop-a-Razzi product that broke during the first year.

28.     CET warranted that the baskets would: (1) be free of defects in material and workmanship; and (2) substantially conform to the above specifications.   Furthermore, the

parties agreed that L&P would not be permitted to substitute materials without CET's consent.

29.    The parties agreed that L&P would be the *exclusive* seller, during the term of the agreement, of all of CET's requirements for its Hop-a-Razzi baskets.

30.    The term of the agreement was for two years, subject to certain early termination rights, with successive one-year automatic renewal terms, unless one party gave written notice to the other party of its intent not to renew the agreement, at least 90 days in advance of the end of the term then in existence.

31.    CET's initial order was for 9,415 baskets, consisting of 5,900 of the Hop Classic; 1,960 of the Hop Junior; and 1,555 of the Hop Pro.  The cost of each basket was set by the parties based on the mutual agreement that orders for the baskets were likely to exceed 100,000 units.  The agreed price for the Classic was $12.49 per basket; the agreed price for the Junior was $25.56; and the agreed price for the Pro was $29.74.

32.    The parties agreed that CET would make a deposit of $74,815 (44% of the aggregate price of the first order) before any product was manufactured and shipped.   On November 20, 2012, CET paid the required deposit.  The balance of the purchase price was to be paid net 90 days from the date of the shipment to CET's facility at 1801 Janke Drive, Northbrook, Illinois, 60062.

*--CET Receives the Baskets*

33.    CET received the shipment of 9,415 Hop-a-Razzi baskets in six different containers over the course of a few months.  The first shipment was received on approximately February 22, 2013, and the last of the six containers was received by June 30, 2013.

34.    Unfortunately, it become apparent that the baskets produced and shipped by L&P did not conform to the agreement reached between the parties; indeed, the baskets did not even

come close to meeting CET's expectations under the parties' agreement.

***--The Actual Baskets Produced***

35.     First, the wheel bracket on the baskets received from L&P sat higher than the wheel bracket on the sample baskets, which caused the baskets to drag on the ground when being used unless they were substantially tilted and led to the balls spilling on the ground when the basket was full.  More specifically, the positioning of the wheels on the prototype basket was at 2.5 inches from the top of the bracket to the bottom of the basket, but the position of the wheels on the baskets delivered by L&P was 2.75 inches from the top of the bracket to the bottom of the basket.   It also resulted in difficult basket manipulation by taller players due to the lowering of the handle point.

36.     The size of the wheel on the baskets received from L&P was also smaller than the wheel on the sample baskets.  While the parties agreed to a wheel size of 13 mm, the wheel size on the actual baskets produced was 11 mm.

37.     On the sample baskets CET provided to L&P, the pins were facing the back of the basket, but on the baskets that L& P produced, the pins faced the front of the basket, which caused the baskets to be ascetically displeasing and compromised their functionality. Furthermore, the correct pins were not used.  L&P did not used the agreed upon solid pin, which caused several instances of spring pin failure (*i.e.*, the pin would break) and compromised the basket's telescoping feature.  The pin length was also made too short, causing the handle lever to fall through the bottom of the basket and damaging the integrity of the handle tube.

38.     Additionally, there was substantial "movement" of the handles on the baskets produced by L&P, and the space between the pin holding together the handles was to be tightened and more taut, allowing for a solid basket structure, but it was not.

39.     The steel wire on the basket main body and lid was to be 5.55 mm in diameter, but instead, the basket produced by L&P had a diameter of 5.26 mm, causing the baskets to bend and not properly function to pick up the balls when the basket was placed on top of them. The bottom wires would compress in together and collapse the bottom area of the basket.

40.     The welding of the basket produced by L&P was sloppily performed and not completed to be a 360 degree weld, and, often, the material around the weld was not substantial enough to support the weld.

41.     The paint on the L&P baskets was scuffed and had blatantly obvious, careless touch-ups with, what looked like, nail polish. Further, the "Hop-a-Razzi" decal labels appeared "chewed up," ragged and faint, which caused the overall product to look used and unprofessional.

42.     The handles of the basket produced by L&P were supposed to have a "crimp" in the top of the curve, but the baskets produced did not have such crimp.

43.     A good portion of the baskets were missing rubber, wire protection stoppers, which were supposed to be placed on the baskets to protect the wire from touching the ground.

44.     To top it off, the baskets L&P produced appeared deformed, which damage could have occurred in shipping and transport. Prior to the manufacture of the baskets, Plaintiff Turdo had numerous conversations with Ben Cuthbert, L&P's Branch Manager of Machinery and R&D, about precisely how the baskets needed to be packed and shipped. Unfortunately, L&P did not pack and ship the baskets as they had agreed to, including failing to put the baskets in protective bags before putting them in boxes, using boxes that were too thin so parts of the baskets were poking through the boxes, and the Hop Junior and the Hop Pro were packed two-to-a-box, without anything protecting or separating the baskets.

*--CET Notifies L&P of the Problems with the Baskets*

45.     On February 23, 2013, the day after receiving the first shipment of baskets, CET notified L&P of the above issues with the baskets.  As additional shipments arrived, CET continued to notify L&P of the fact that the baskets did not come close to meeting the agreed upon specifications.

46.     On approximately July 3, 2013, Mr. Cuthbert flew to Chicago to examine the baskets for himself.  Of the 250 baskets surveyed as a sample, only ten of the baskets were useable.  Over the course of the following four weeks, Mr. Cuthbert asked CET to examine all baskets shipped.  Of the 9,415 baskets, only approximately 100 did not have paint and bent wire issues, but all of the baskets were manufactured with the wrong wire size, the incorrect pin and with the pins showing toward the front of the basket when they were supposed to be facing the rear of the basket, had poor workmanship on the decals, had handle issues, and sloppily performed welding.

47.     After L&P saw the issues with the baskets for themselves, L&P manufactured new samples of three of each style basket and shipped two of each style to CET, which baskets arrived on approximately January 3, 2014.

48.     Despite sending the revised sample baskets, L&P virtually disappeared, stating their baskets/pins were in customs and then never followed up with CET.

49.     After several emails and calls by CET to L&P, which went unanswered, on March 5, 2014, Tom Wells, Jr., then President of the Machine Products Division for L&P finally had a telephone conversation with Ms. Turdo, during which he acknowledged the substantial shortcomings of the baskets.  Unfortunately, no further action was taken by L&P, and CET's reputation and business have been irreparably harmed by providing low quality products (with

the severely limited number of baskets that were usable and not being able to fulfill orders due to the fact that CET did not have properly functioning baskets).

50.     In January, 2014, Hop-a-Razzi was named the official ball basket of the United States Professional Tennis Association "USPTA," due to the hard work of Plaintiff Turdo and her marketing efforts of the innovative nature of the Hop-a-Razzi baskets.  Unfortunately, because L&P breached its duties to CET, CET has not been able to meet its endorsement responsibilities with the USPTA, which has been very harmful to CET.

51.     In this action, CET seeks to recover its damages, including the millions of dollars in lost profits that it has suffered due to L&P's breaches of its legal duties.

## COUNT ONE
## Breach of Contract

CET realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

49.     As set forth above, the parties reached an agreement for the manufacture, sale and purchase of Hop-a-Razzi baskets, including that L&P was to manufacture the baskets as closely as possible to CET's sample baskets that had been previously manufactured by Microtech.

50.     CET accepted the goods tendered by L&P, as set forth above, and promptly notified L&P that the goods did not conform to the contract, as described above, including, but not limited to the following:

- The baskets L&P delivered were not functional as CET intended.  (*See, e.g.*, *supra*, ¶¶ 35-44) (the baskets sat too low and dragged on the ground, causing spillage of balls, the pins frequently broke and compromised the baskets' telescoping feature);

- L&P's baskets did not meet the agreed upon specifications.  (*See, e.g.*, *supra*, ¶¶ 22-32; 35-44) (the size of the wheel on the baskets was 2mm shorter than the agreed upon size; the basket handles did not have a "crimp" in the top of the curve; and the wrong size wire was used);

- L&P's baskets were poorly assembled. (*See, e.g.*, *supra*, ¶¶ 35-44) (L&P's pins faced the wrong way, as compared with the sample basket; and there was substantial movement of the basket handles); and

- L&P's baskets appeared deformed, and the paint on the baskets was scuffed and poorly touched up. (*See supra*, ¶¶ 41, 44.)

51.    CET promptly notified L&P of its breach of contract.

52.    As a consequence of L&P's breach of contract, CET was damaged as a result of the breach of the oral agreement and the implied covenant of good faith and fair dealing.

53.    As a further consequence of L&P's breach of contract, CET incurred incidental and consequential damages. Specifically, CET lost its fundamental customer base and, as a corollary, millions of dollars in lost sales and lost profits. Eventually, the loss of its sole revenue stream caused by this breach led to the substantial demise of CET's business.

54.    CET's consequential damages could not reasonably be prevented by cover or otherwise, because any effort to obtain substitute goods would have been futile given the high degree of specification of its baskets and the timely nature of CET's outstanding contracts with third parties.

## COUNT TWO
## Breach of Express Warranty

CET realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

55.    After CET insisted on specific terms with regard to the dimensions and materials L&P was to use in manufacturing the baskets, the parties reached an agreement for the sale of Hop-a-Razzi baskets as detailed above. In addition, L&P agreed to manufacture the baskets as closely as possible to CET's sample baskets, which were previously manufactured by Microtech.

56.     Furthermore, CET warranted that: (1) the baskets would be free of defects in material and workmanship; and (2) the baskets would substantially conform to the above specifications.  Furthermore, the parties agreed that L&P would not be permitted to substitute materials without CET's consent.

57.     Under Illinois law, an express warranty is created in three ways: (a) any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain; (b) any description of the goods which is made part of the basis of the bargain created; and (c) any sample or model which is made part of the basis of the bargain.  810 ILCS 5/2-313(1).

58.     As part of the consideration for CET's purchase of the goods, an express warranty arose as follows:

- After CET provided L&P with sample baskets for each of its products, L&P agreed to create and mass produce replicas or baskets that conformed as closely as possible in all material aspects to the sample baskets, except as otherwise agreed upon.

- L&P promised to produce baskets according to specific dimensions, materials and assembly to be used and implemented in order to manufacture replicas of the sample baskets and to enhance the durability of the baskets.  (*See supra*, ¶¶ 21-32.)

- CET warranted that the baskets would: (1) be free of defects in material and workmanship; and (2) substantially conform to the above specifications.  Furthermore, the parties agreed that L&P would not be permitted to substitute materials without CET's consent.

59.     The terms and specifications of the baskets described by CET, based on CET's sample baskets, were the crux of the parties' agreement, and L&P's affirmation and promise to deliver these goods in accordance with those terms and specifications formed the basis of the parties' bargain.

60.     CET relied upon L&P's promise to manufacture baskets very similarly to CET's sample baskets at a lower price and in accordance with the specific terms and specifications insisted on by CET.

61.     At the time of sale and delivery, the baskets were not as warranted to CET for the following reasons:

- The baskets L&P delivered were not functional as CET intended. (*See, e.g.*, *supra*, ¶¶ 35-44) (the baskets sat too low and dragged on the ground, causing spillage of balls, the pins frequently broke and compromised the telescoping feature).

- L&P's baskets did not meet the agreed upon specifications. (*See, e.g.*, *supra*, ¶¶ 35-44) (the size of the wheel on the baskets was 2mm shorter than the agreed upon size; the basket handles did not have a "crimp" in the top of the curve; and the wrong sized wire was used).

- L&P's baskets were poorly assembled. (*See, e.g.*, *supra*, ¶¶ 35-44) (L&P's pins faced the wrong way, as compared with the sample basket, and there was substantial movement of the basket handles).

- L&P's baskets were not identical, nor similar in all respects, to the sample baskets CET provided. (*See, e.g.*, *supra*, ¶¶ 35-44 ) (L&P's basket handles did not have a "crimp" in the top of the curve, as compared with the sample baskets).

- L&P's baskets appeared deformed, and the paint on the baskets was scuffed and poorly touched up. (*See supra*, ¶¶ 41, 44.)

62.     As a consequence of L&P's breach of express warranty, CET incurred the following losses and damages resulting in the ordinary course of events from the breach, including, but not limited to, loss of its deposit, storage, shipment and other costs and, most significantly, lost profits.

63.     CET's consequential damages could not reasonably be prevented by cover or otherwise, because any effort to obtain substitute goods would have been futile given the high

degree of specification of its baskets and the timely nature of CET's outstanding contracts with third parties.

**COUNT THREE**
**Breach of the Implied Warranty of Merchantability**

CET realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

64.     After CET insisted on specific terms with regard to the dimensions and materials L&P was to use to manufacture the baskets, the parties reached an agreement for the sale of Hop-a-Razzi baskets as detailed above.  L&P agreed to manufacture the baskets as closely as possible to CET's sample baskets, which were previously manufactured by Microtech.  As detailed above, L&P sold and delivered the baskets to CET.

65.     Illinois law provides an implied warranty of merchantability for "merchants" selling goods.  In order to pass as "merchantable" under the Illinois statute, the goods must: (a) pass without objection in the trade under the contract description; (b) for fungible goods, be of fair average quality within the description; (c) be fit for the ordinary purposes for which such goods are used; (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit, (e) be adequately contained, packaged and labeled as the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label.  810 ILCS 5/2-314(2).

66.     A "merchant" is defined as "a person who deals in goods of the kind or otherwise by his occupation, holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."  810 ILCS 5/2-104(1).

15

67.     An implied warranty of merchantability arose because L&P is a "merchant." L&P advertises itself as having been incorporated and specializing in manufacturing for over a century.[1]   In its 2013 annual report, L&P highlights that it has "19,000 employee-partners and 130 manufacturing facilities located in 18 countries."[2]   Finally, L&P's then President, Mr. Martin, clearly holds L&P out as an experienced manufacturer, as evidenced by his offer to manufacture CET's products at a lower price than CET's then-current manufacturer.

68.     At the time of sale and delivery, L&P's baskets did not pass as "merchantable" under the Illinois law because, as noted, *supra*, the baskets were not functional, did not meet the specifications agreed upon, were poorly assembled and appeared deformed.

69.     Consequently, L&P's defective baskets would not (and did not) pass without objection in the trade; neither did the basket function, within the variations permitted by the agreement, of even kind, quality and quantity; nor would the baskets be fit to be used for their ordinary purpose.   In fact, operation of L&P's baskets led to spillover of the tennis balls, as opposed to picking them up.

70.     As a consequence of L&P's breach of the implied warranty of merchantability, CET incurred losses and damages resulting in the ordinary course of events from the breach.

71.     As a further consequence of L&P's breach of the implied warranty of merchantability, CET incurred the following incidental and consequential damages resulting from the breach.   Specifically, CET lost its fundamental customer base and, as a corollary, millions of dollars in lost sales and lost profits.   Eventually, the loss of its sole revenue stream caused by this breach led to the demise of CET's business.

---

[1] *See* L&P's company website, "Our Company," *available at*  http://www.leggett.com/home/our-company.
[2] *See* L&P's company website, "Investor Relations: 2013 10-K," *available at* http://www.leggett-search.com/annual-reports/2013/page1.shtml.

72.     CET's consequential damages could not reasonably be prevented by cover or otherwise because any effort to obtain substitute goods would have been futile given the high degree of specification of its baskets and the timely nature of CET's outstanding contracts with third parties.

**COUNT FOUR**
**Breach of the Implied Warranty of Fitness for a Particular Purpose**

CET realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

73.     After CET insisted on specific terms with regard to the dimensions and materials L&P must use to manufacture the baskets, the parties reached an agreement for the sale of Hop-a-Razzi baskets as detailed above.  In addition, L&P agreed to manufacture the baskets as closely as possible to CET's sample baskets, which were previously manufactured by Microtech.  As detailed above, L&P sold and delivered the baskets to CET.

74.     Under Illinois law, when the seller at the time of contracting has reason to know of (1) any particular purpose for which the goods are required; and (2) that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose.  810 ILCS 5/2-315.

75.     As part of the consideration for CET's purchase of the goods, an implied warranty of fitness for a particular purpose arose as follows:

- At the time of contracting, L&P knew or had reason to know that CET's products were innovative ball gathering devices used to gather tennis balls when several balls are scattered throughout a tennis court.

- At the time of contracting, L&P knew or had reason to know that the products were designed to change the way tennis balls are gathered and intended to be mass produced and sold to end-user consumers.

- At the time of contracting, L&P knew or had reason to know that CET would only accept baskets that performed like the sample baskets CET was already selling to end-user customers.

- At the time of contracting, Ms. Turdo, on behalf of CET, relied on L&P's skill and judgment, as an experienced manufacturer, to furnish suitable goods.

76. At the time of sale and delivery, however, the baskets were not as warranted to CET because CET could not sell to end-user customers a product that was damaged and deformed, missing crucial specifications and that would cause tennis balls to spill out.

77. As a consequence of L&P's breach of the implied warranty of fitness for a particular purpose, CET incurred losses and damages resulting in the ordinary course of events from the breach. As a further consequence of L&P's breach of the implied warranty of fitness for a particular purpose, CET incurred the following incidental damages and consequential damages resulting from the breach. Specifically, CET lost its fundamental customer base and, as a corollary, millions of dollars in lost sales and lost profits. Eventually, the loss of its sole revenue stream caused by this breach led to the demise of CET's business.

78. CET's consequential damages could not reasonably be prevented by cover or otherwise because any effort to obtain substitute goods would have been futile given the high degree of specification of its baskets and the timely nature of CET's outstanding contracts with third parties.

## **DEMAND FOR JURY**

79. Plaintiffs demand a jury trial.

## **PRAYER**

**WHEREFORE**, Plaintiffs respectfully request the following relief:

18

1.      Award Plaintiffs their full amount of actual damages, including incidental and consequential damages;

2.      Award Plaintiffs their complete costs, disbursements and reasonable attorneys' fees incurred herein, to the extent authorized under applicable law; and

3.      Award Plaintiffs such other relief as the Court may deem just and appropriate.

Dated: September 26, 2014            CET TENNIS ENTERPRISES, LLC

                                                 By: /s/ John C. Martin
                                                 John C. Martin
                                                 MARTINSIROTT LLC
                                                 30 N. LaSalle Street, Suite 2825
                                                 Chicago, IL 60602
                                                 312-368-9000
                                                 jmartin@martinsirott.com

                                                 Of Counsel:
                                                 J. Michael Dady
                                                 Kristy Zastrow
                                                 DADY & GARDNER, P.A.
                                                 5100 IDS Center
                                                 80 South Eighth Street
                                                 Minneapolis, MN 55402
                                                 (612) 359-9000
                                                 jmdady@dadygardner.com
                                                 kzastrow@dadygardner.com

                                                 Attorneys for Plaintiffs